Robert W. Mockler (SBN 200200)
*rmockler@steptoe.com*
**STEPTOE & JOHNSON LLP**
633 West 5th Street, Suite 1900
Los Angeles, California 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599

Attorneys for Plaintiff,
IMMERSIVE MANAGEMENT HOLDINGS LLC

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMMERSIVE MANAGEEN T HOLDINGS, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>KAHLIL GUZI KARMENU PISCOPO, RYAN KINGHORN,<br><br>Defendants. | Case No.: 2:23-cv-9762<br><br>**COMPLAINT FOR MISREPRESENTATION**<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT

1

Plaintiff Immersive Management Holdings LLC ("IMH") submits its Complaint against Kahlil Guzi Karmenu Piscopo and Ryan Kinghorn and alleges as follows:

## I. INTRODUCTION

1. IMH is in the business of developing media programs and location-based experiences, including Westworld style theme parks that use virtual reality and digital effects technology to give consumers realistic, immersive experiences of, for example, an ancient culture. IMH's principals, including CEO Cary Granat and COO Ed Jones, have decades of experience in the entertainment industry. They conceived of IMH and its affiliated company, Immersive Artistry LLC, and their affiliates as first movers in a new kind of entertainment experience.

2. Since 2014, Granat and Jones have built an industry leader in the location-based space, with partnerships with the NFL Pro Football Hall of Fame, Caesars, Poly of China, International Realty Group LLC, and the Texas Rangers, among others. Granat and Jones and their teams have raised more than $50 million in equity and millions more in partnership spend for their core projects.

3. To bring Immersive Artistry LLC, and its subsidiaries, to the next phase of its growth, IMH sought to partner with funders in a joint venture that would assume control of Immersive Artistry's respected technology group, creative teams and locations' business, and provide the funding for growth. IMH would contribute the operations, technology and creative teams of Immersive Artistry LLC and its subsidiaries; the funder would bring a minimum of $45 million of funding to a 50/50 venture that would own and control Immersive Artistry LLC and its subsidiaries. The holding company venture would be rebranded under the name Culture Fusion LLC.

4. Several investors showed interest in this proposed joint venture and IMH had various sources of funding to consider.

5. One investor, Indigo Dragon Group (UK) Ltd ("IDGL"), approached

Granat and Jones in early 2020. IDGL, through its CEO, Defendant Kahlil Guzi Karmenu Piscopo, and its purported COO, Defendant Ryan Kinghorn, represented IDGL as a sophisticated company experienced with large investments around the world and substantial funds of over a billion in European currency under their control. They indicated that IMH's project fit squarely within their investment mandate and asked Granat and Jones to develop an immersive experience to transport people around the world into "First Nations" of the United States, Canada, China, Australia, and Latin America. Mr. Piscopo indicated that IDGL would be interested in being IMH's partner and funding the joint venture, which would be called Culture Fusion, and wished to proceed immediately.

6. Mr. Piscopo and Mr. Kinghorn told IMH that IDGL had more than sufficient capital to make an initial $15-45 million investment to launch Culture Fusion. Indeed, Defendants regularly referred to, and showed IMH evidence of, investments in the hundreds of millions of dollars and capital backing in the billions of dollars. Based on these representations, IMH decided to move forward. In doing so, as Defendants knew, IMH gave up on other potential sources of capital; especially an incoming funding of $30 million that was scheduled for the first week of April.

7. IMH and IDGL signed the Letter Agreement on April 2, 2020. Based on Defendants' representations, IMH proceeded with the Culture Fusion venture and formally ceased a deal with investors in Europe and ended discussions with an Asian investment group. As contemplated in the Letter Agreement, IMH began work on the joint venture project with IDGL and signed agreements with partners. IMH worked diligently at sourcing locations and deals with the United Nations in NYC and locations in Australia to support Defendants' and IDGL' desire to proceed with the First Nations project.

8. The Letter Agreement calls for an initial investment of $45 million, to be made in two tranches, the first upon signing of the Letter Agreement and the

balance of funds by May 8, 2020. The day after signing, as promised, Mr. Piscopo set out a schedule to fund the entire $45 million over the next week, and represented that an additional $100 million in funds would be forthcoming for expansion of projects. But no funding came that week. Mr. Piscopo apologized and promised a swift resolution over the next 24 hours. But none came.

9. On April 28, Mr. Piscopo stated "we are not in breach of the written agreement as it clearly states on or before the 8th of May, 2020." May 8, 2020 came and still IDGL failed to provide any funds. For several months thereafter, Defendants continued to acknowledge, in telephone calls, emails, WhatsApps, and texts, and then through counsel, the obligation to fund. Mr. Piscopo and Mr. Kinghorn continued to represent that funds would be dispatched tomorrow, the next day or certainly next week. In multiple cases they communicated, in writing and orally, that funds had already been wired. Mr. Piscopo gave details of bankers, banks, and often specified times when the funds would clear IMH's accounts. But these statements were false.

10. Even after IMH initiated an arbitration proceeding under the Letter Agreement to secure IDGL's performance of its obligations, Defendants continued to represent that funding would soon be provided. IMH continued to rely on Defendants' promises, to incur additional obligations based on the promised funding, and to forego other lucrative opportunities. To this day, IMH has not received a single dollar of the promised $45 million.

11. When it executed the Letter Agreement in reliance on Defendants' statements, IMH released other sources of funding that were available through its affiliates. As a result, it cannot now simply obtain funding from a different source. Even if it could, the delay could be fatal to IMH and Immersive Artistry's market position.

12. As a result of Defendants' continued fraudulent representations about funding, IMH and its affiliated businesses have been unable to make good on the

1  many commitments it has made in furtherance of the joint venture. IMH has also
2  been unable to pursue the joint venture in the manner that it had planned. That, in
3  turn, threatens IMH's first mover advantage in the location-based experiences
4  space.
5     13.   IMH has also suffered opportunity costs and its principals have
6  suffered reputational costs as a result of Defendants' continued fraudulent
7  representations. IMH and its principals gave up significant other business
8  opportunities to proceed with Defendants, opportunities that would have resulted in
9  profits to IMH of tens of millions of dollars. Having built relationship and
10 reputations in the entertainment industry for decades, they now have to explain to
11 their partners why their promising venture lacks funding.

## II.   PARTIES

13     14.   Plaintiff IMH is a Delaware LLC based in Los Angeles. IMH is in the
14 business of developing location-based experiences.
15     15.   IMH's principals are CEO Cary Granat and COO Ed Jones. Mr.
16 Granat spent years working in Hollywood. He served as president and COO of
17 Miramax Films' Dimension Division from 1995 to 2000. He then co-founded
18 Walden Media and served as its CEO from 2000 to 2009. Mr. Granat's many films
19 include Walden Media's production of C.S. Lewis' The Lion, The Witch, and the
20 Wardrobe, Scream, Journey to the Center of the Earth, Scary Movie, Amazing
21 Grace, and Spy Kids.
22     16.   Mr. Jones is an Academy Award-winning industry leader and pioneer
23 in digital media, specializing in 2D and 3D visual effects and animation. Mr. Jones
24 started his career at George Lucas' Industrial, Light and Magic, working on films
25 including the original Star Wars, the Indiana Jones movies, E.T. and The
26 Terminator series. He has worked in lead VFX roles with Dream Works,
27 Paramount Pictures, and Warner Bros. and has also been CEO of Warner's ESC
28 Entertainment and Kodak's Cinesite. Most recently, he worked at Reel FX, where

he supervised the technical design and production for the wildly popular Despicable Me and The Simpsons rides at Universal City, as well as The Ferrari Ride in Abu Dhabi. Mr. Jones won Academy Awards for his work on Who Framed Roger Rabbit and Happy Feet.

17. Defendant Kahlil Guzi Karmenu Piscopo is the Managing Director/CEO of IDGL. He is an Australian national who lives in Hong Kong.

18. Defendant Ryan Kinghorn was a purported member/partner and COO of IDGL. Mr. Kinghorn is an Australian national who lives in Australia.

19. Non-party IDGL is a United Kingdom limited company, with its headquarters in Hong Kong. As represented by Defendants, IDGL "specializes in management and investment of client assets and liquid funds with special emphasis on green energy preservation and protecting the environment." According to IDGL's presentation materials, it has "assets under management in excess of ten digits in Euro currency in addition to having its own assets and cash funds of a similar amount." IMH and IDGL are parties to a JAMS arbitration proceeding under the Letter Agreement.

### III. JURISDICTION & VENUE

20. Jurisdiction is proper under 28 U.S.C. § 1332(a)(2). Plaintiff IMH is a Delaware LLC based in Los Angeles and its two members, Cary Granat and Ed Jones, are individuals who are citizens of California and Texas, respectively. Defendants are citizens or subjects of foreign states who are not lawfully admitted to the United States for permanent residence and who are not domiciled in California. The amount in controversy exceeds $75,000.

21. Venue is proper in the Central District of California because IMH is based in Los Angeles and a substantial part of the events or omissions giving rise to the claim occurred in the Central District of California. 17 U.S.C. § 1391(b)(2).

///
///

## IV. BACKGROUND

### A. Immersive Artistry and Culture Fusion

22. In 2014, Mr. Granat and Mr. Jones conceived of a plan to use Mr. Granat's experience with film production and Mr. Jones's experience with digital effects to launch a company that would develop and create location-based experiences. These Westworld-style theme parks would allow customers to be transported, through virtual reality and visual effects technology, to other lands and other worlds.

23. One such concept was "The Christmas Village," which was conceived as a unique immersive experience where guests would be transported into the Arctic on an ice breaker ship to discover the famed North Pole. As guests passed through the Gates of Santa's origin city, they would encounter a vibrant world of toy making factories, mail shops, more than 50 North Pole vendors, an ice-skating rink, a reindeer training facility, a Nativity world, and much more. In essence, Immersive Artistry and IMH bring worlds to life in a magical and unique manner that engage all of the guests' senses.

24. Mr. Granat and Mr. Jones created IMH, as well as various affiliates, including Immersive Artistry LLC, to implement their vision. They raised tens of millions of dollars from 2014 to 2019 to fund their business. But Granat and Jones wanted to continue to expand their vision. Accordingly, IMH went in search of the right strategic investor, who could partner with IMH in a joint venture called Culture Fusion Ltd. ("Culture Fusion") by providing a capital contribution that would be used to fund existing and new concepts such as the First Nations project, buy out the existing board members of Immersive Artistry, and grow the company.

25. IMH had several potential sources of funding in addition to IDGL, including through Immersive Artistry Holding Company, Ltd. ("IAHC"), an IMH affiliate. IMH chose to proceed with IDGL because, as represented by Defendants, it had substantial capital backing, extensive experience with funding and the ability

proceed to fund without delay. During discussions leading up to the execution of the Agreement, IMH emphasized that the funding was very important to the ongoing operations of IMH, Immersive Artistry, and its subsidiaries.

26. Defendants well understood IMH's needs. Mr. Piscopo expressed excitement about the proposed joint venture and confidence in IDGL's ability to fund not only the amounts contemplated by the parties at the time, but substantial additional amounts if needed to expand the venture. Defendants told IMH that IDGL had billions of dollars that they needed to invest in certain categories, which included the Culture Fusion concept. Mr. Piscopo also expressed the desire for IMH and Immersive Artistry to help fulfill his own personal vision to make the First Nations project a reality.

27. IDGL conducted due diligence on IMH, Immersive Artistry and Culture Fusion and the parties came to terms and executed a binding agreement.

### B. The Letter Agreement

28. On April 2, 2020, IMH and IDGL executed the Letter Agreement, in which IDGL agreed to fund $45 million for Culture Fusion as a 50/50 joint venture between IMH and IDGL. Mr. Piscopo executed the Letter Agreement on behalf of IDGL. The Letter Agreement is straightforward. It calls for IDGL to provide the $45 million in two tranches, at least $15 million upon execution of the Letter Agreement and the balance of the $45 million by May 8, 2020:

> Advance Capital Contributions. On the date hereof, IDG shall fund a portion of its capital contribution in an aggregate amount of between $15,000,000.00 to $30,000,000.00 (such amount actually funded, the "Initial Advance Contribution") to IMH using the wire information provided on Exhibit A. On or prior to May 8, 2020, IDG agrees to fund the remaining portion of its capital contribution in the aggregate amount of

> $45,000,000.00 less the Initial Advance Contribution in one or more payments (each such payment, a "Subsequent Advance Contribution" and together with the Initial Advance Contribution, the "Advance Contributions") to IMH (or once Culture Fusion is formed, to Culture Fusion) on or prior to May 8, 2020.

Letter Agreement, Clause 1. This provision, by its terms, states that IDGL "shall fund" the Initial Advance Contribution and that IDGL agreed to fund the remaining amount due on the $45 million capital contribution by May 8, 2020. The Letter Agreement does not provide IDGL any basis to refuse to fund the capital contribution or provide it any mechanism to further negotiate the funding deadlines.

29. In turn, IMH agreed that the funds would be considered capital contributions in the joint venture company and would be used on the venture:

> The Parties hereby agree that any Advance Contributions paid to IMH shall be treated as a capital contribution to Culture Fusion once it is formed. The proceeds for any Advance Contributions will be used to fund and control the operations of Culture Fusion, including the operations of Immersive Artistry and its subsidiaries, and to develop First Nation projects. The Parties intend to collaborate on a second phase budget and funding, which will be used for build out and operations of Culture Fusion projects.

Letter Agreement, Clause 1.

30. The Letter Agreement also requires IMH to terminate its source of funding through IAHC. As acknowledged in Clause 2 of the Letter Agreement, IAHC was formed for "the purposes of investing in and funding the operations of Immersive Artistry." IMH agreed in the Letter Agreement, however, "that it will

cause IAHC to terminate any agreements for investments in Immersive Artistry and its subsidiaries." *Id.* In other words, Clause 2 obligated IMH to proceed with IDGL and to give up its primary other potential source of funding.

31. Clause 2 of the Letter Agreement allows IMH to terminate this restriction only "if [IDGL] has not funded its full capital contribution of $45,000,000 on or prior to May 8, 2020." On the other hand, the Letter Agreement provides that IDGL "shall fund" and provides it no right for it to decline to fund.

C. IMH's Performance under the Letter Agreement in Reliance on Defendants' Promises

32. Following execution, IMH began performing its obligations under the Letter Agreement. It took steps to terminate other funding options. It made preparations for Culture Fusion to assume control of Immersive Artistry, including by obtaining approval from board members to transfer their rights. IMH also executed agreements and made commitments with various third parties and vendors required to pursue various projects, including the Christmas Village and First Nations projects. IMH worked every day to advance Culture Fusion.

33. The day after the Letter Agreement was executed, Friday, April 3, 2020, Mr. Piscopo proposed a schedule to fund the entire $45 million over the following week: $10 million would be funded on Monday, April 6, $5 million on Tuesday, April 7, and $30 million on Thursday, April 9. But the week came and went, with no funding.

34. On April 10, Mr. Piscopo sent a lengthy email to Mr. Granat and Mr. Jones that blamed IDG's failure to make good on its funding commitments on "trading cycles." He reiterated that IDGL had in excess of $17 billion in assets under management and promised that funds would arrive by April 13. Mr. Piscopo assured IMH that he would "focus on ensuring these funds are made available as soon as they are available to us and [as] I had said take my partners seriously in all aspects and my friends even more so. I consider you both to be friends and

partners."

35. No funding came on April 13. Notwithstanding the importance of timely receipt of the funds, IMH remained patient and sought to assist IDGL in making good on its commitments. IMH proposed using its own connections with financial institutions to resolve whatever issues IDGL was having with funding, but IDGL declined and still failed to fund.

36. Defendants continued to promise funding in written and voicemail communications on April 21, 23, 24, 25, 26, 27, 28, and 30. Both Mr. Piscopo and Mr. Kinghorn represented to Mr. Granat and Mr. Jones that funds would be dispatched shortly or even that funds were already on the way.

37. For example, on April 23, 2020, Mr. Piscopo indicated that everything had been completed so that Citibank could wire funds to the IMH's account referenced in the Letter Agreement. IDGL did not wire any funds. On April 27, 2020, Mr. Piscopo indicated that he expected a "breakthrough" "tomorrow."

38. On April 28, after IDGL had strung IMH along for weeks, Mr. Piscopo stated "we are not in breach of the written agreement as it clearly states on or before the 8th of May, 2020." IDGL, however, did not provide any funding by May 8 and, at that point, by its own admission, was in breach of the Letter Agreement.

39. On an almost daily basis through May, Defendants continued to promise, in written and verbal communications, that IDGL would provide the funding shortly, and often provided specific dates and times that IMH should expect funds to arrive. No funds arrived.

40. On May 16, 2020, Mr. Piscopo claimed that IDGL could not provide the funding because of the problems with the global economy: "I have to again apologise for the delay in sending you the much needed investment funds for investing in [Immersive Artistry] and the funds to commence [Culture Fusion] operation." He thanked Mr. Granat and Mr. Jones for their patience and said he had

been advised that funds would be available that week.

41. Later in May, Mr. Piscopo left voicemail messages indicating that funding was coming from Credit Suisse or Royal Bank of Canada. This was a consistent practice of Defendants. Mr. Piscopo represented that he had accounts with and could fund from financial institutions including Citibank, HSBC, Bank of America, Royal Bank of Canada, and Deutsche Bank. IDGL also represented that it works with a paymaster called Global Development House ("GDH") to facilitate the funding and on certain occasions blamed GDH for delays.

42. Finally, on May 29, 2020, IMH, through counsel, sent a demand letter seeking the funds by June 1, 2020. Mr. Piscopo responded on May 31 with another list of excuses. For example, he said that the "global pandemic" had affected their ability to fund even though the lockdown orders in Hong Kong, the United Kingdom, and California had gone into effect before the Letter Agreement had been executed. Defendants were well aware of the pandemic when they negotiated the Agreement and agreed to the deadline for funding. In any event, Defendants did not explain why bank wire transfers would be affected by the pandemic.

43. On June 4, IDGL responded through counsel. IMH initially welcomed the involvement of counsel, hoping that he might be able to facilitate funding as promised by Defendants, and agreed to delay initiating arbitration to give time for Defendants to make good on their promises. But it soon became clear that they were just making the same empty promises, now through counsel. Mr. Piscopo and Mr. Kinghorn continued each week to promise funding "this week." But many "this weeks" came and went without funding. Finally, running out of patience and experiencing increasing pressure from its own counterparties, IMH initiated a JAMS arbitration proceeding under the Letter Agreement.

**D.    The Related Arbitration Exposes Further Fraud**

44. Clause 5 of the Letter Agreement contains a mandatory arbitration provision:

> any dispute under or relating to the terms of this Letter Agreement
> or any breach thereof . . . shall be submitted to binding arbitration
> by JAMS, before a single arbitrator (who will have extensive
> experience arbitrating disputes in the entertainment industry), in
> Los Angeles, California in accordance with the rules promulgated
> by said association and any judgment and award rendered thereby
> may be confirmed by any court having jurisdiction thereof.

45. Pursuant to this provision, IMH commenced an arbitration against IDGL, Mr. Piscopo, and Mr. Kinghorn for breach of the letter agreement and fraud. JAMS provided notice to all parties on August 6, 2020 that it had received IMH's Request for Arbitration.

46. In response, Mr. Kinghorn and Mr. Piscopo objected that the JAMS did not have jurisdiction over the claims alleged against them. As part of that objection, on October 21, 2020, Piscopo stated that "Kinghorn is not and has never been a director or shareholder of [IDG] and so should not be a party enjoined in this dispute." Mr. Piscopo's statement to JAMS regarding Mr. Kinghorn's relationship and role with IDG revealed another misstatement of material fact as both Mr. Piscopo and Mr. Kinghorn represented otherwise during the negotiations prior to and after execution of the Letter Agreement.

47. As a result of the jurisdictional objection, on November 18, 2020, JAMS indicated that it would proceed with the arbitration only against IDGL as the party to the arbitration agreement.

48. On September 23, 2021, following an arbitration hearing at which IDGL failed to appear despite receiving proper notice, the arbitrator issued an award in favor of IMH and against IDGL. IMH petitioned this Court to confirm the award. On April 12, 2022, this Court granted the petition and enforced the award, entering it as a judgment. *Immersive Management Holdings LLC v. Indigo Dragon Group (UK) Ltd.*, Case No. 2:21-cv-08895-FMO-GJS.

13
COMPLAINT

Plaintiffs previously filed this case in this Court, but Defendants resisted and evaded service of process, despite receiving actual notice of the proceeding. The Court dismissed that action without prejudice. *Immersive Management Holdings LLC v. Piscopo*, *et al.*, Case No. 2:21-cv-00155-RGK-RAO. This case follows.

### E. Defendants' Misrepresentations and Omissions Caused IMH Irreparable Harm

48. IMH files this proceeding to remedy the substantial losses and irreparable harm it has suffered as a result of Defendants' conduct. IMH built on its relationships to get ready to launch Culture Fusion. It made operational commitments to partners, employees, and high-profile board members, based on Defendants' promises. As a result of the lack of funding and Defendants' misrepresentations, IMH has limited ability to make good on the many commitments it has made in furtherance of the joint venture.

49. IMH also gave up significant other business opportunities to continue to pursue the partnership with IDGL. IMH released other sources of funding through IAHC. But, in reliance on Defendants' promises, IMH also gave up multiple profitable opportunities around the world that, conservatively, would have resulted in profits to IMH in the tens of millions of dollars.

50. Defendants' wrongful conduct also has caused reputational damage. IMH's principals, including in particular Mr. Granat and Mr. Jones, have, over decades, built their reputations and relationships with partners including other companies, banks and governments. As a result of Defendants' failures, IMH has had to scramble to explain to their partners, employees and board members why their venture lacks the promised funding.

51. Finally, IMH hoped to leverage a first mover advantage in the location-based experience space. Defendants' repeated misrepresentations threaten to impair that advantage, at a staggering cost to IMH.

## V.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION FOR FRAUD/MISREPRESENTATION AGAINST DEFENDANTS

52. IMH incorporates by reference all preceding paragraphs as set forth fully herein.

53. Defendants made false or misleading statements to IMH and/or failed to disclose material information to IMH, including that IDGL would provide funding to IMH as required by the Letter Agreement.

54. Defendants made those statements intentionally, recklessly or negligently and Defendants had no reasonable grounds for believing the representations were true when they made them.

55. IMH reasonably relied on Defendants' false statements, including by making commitments and entering into agreements based on representations that IDGL would comply with its obligations in the Letter Agreement.

56. IMH has been harmed as a result of Defendants' fraud and/or misrepresentations.

### SECOND CAUSE OF ACTION
### FRAUDULENT INDUCEMENT AGAINST DEFENDANTS

57. IMH incorporates by reference all preceding paragraphs as set forth fully herein.

58. Defendants induced IMH to execute the Letter Agreement with false representations of present fact collateral to the contract including, but not limited to, IDGL's access to billions of dollars in capital that Defendants had access to for funding the requirements under the Letter Agreement.

59. Defendants made those statements intentionally, recklessly or negligently and Defendants had no reasonable grounds for believing the representations were true when they made them.

60. IMH reasonably relied on Defendants' false statements, including by making commitments and entering into agreements based on representations that IDGL would comply with its obligations in the Letter Agreement.

61. IMH has been harmed as a result of Defendants' fraud and/or misrepresentations.

62. IMH's harm includes special damages caused by the misrepresentations that induced it to execute the Letter Agreement. Specifically, Defendants' actions fraudulently induced IMH to forego other funding opportunities and business opportunities. These damages caused harm to the value of IMH's business, loss of goodwill, and loss of enterprise value.

63. IMH will suffer irreparable harm from Defendants' conduct and the balance of equities favors IMH.

## THIRD CAUSE OF ACTION
## ADDING DEFENDANTS AS JUDGMENT DEBTORS AS ALTER EGOS
## (Cal. Civ. Proc. Code §187)

64. IMH incorporates by reference all preceding paragraphs as set forth fully herein.

65. IMH is a judgement creditor on the judgment in the case *Immersive Management Holdings LLC v. Indigo Dragon Group (UK) Ltd.*, Case No. 2:21-cv-08895-FMO-GJS ("Judgment").

66. Defendants had control of IDGL and the litigation that led to the Judgment and were represented in that proceeding.

67. There is such a unity of interest and ownership that the separate personalities of IDGL and Defendants do not exist and an inequitable result will follow if the acts are treated as those of the IDGL alone.

68. Among other things, Defendants owned and/or controlled IDGL; IDGL was undercapitalized; Defendants used IDGL as a mere shell for their affairs; Defendants, on behalf of IDGL, made misrepresentations as set forth

above; and, on information and belief, IDGL did not observe proper corporate formalities.

## VI. PRAYER FOR RELIEF

69. IMH respectfully requests an award of:

    (i) damages according to proof;

    (ii) special damages according to proof;

    (iii) an order adding Defendants as Judgment Debtors on the Judgment;

    (iv) attorneys' fees, costs, and expenses to the extent allowed by law; and

    (v) any additional and further relief to which IMH may be entitled.

## JURY TRIAL DEMAND

Plaintiff respectfully demands a trial by jury of all issues triable.

DATED: November 17, 2023    Respectfully submitted,

STEPTOE & JOHNSON LLP


By: */s/ Robert W. Mockler*
    Robert W. Mockler
    Attorneys for Plaintiff
    IMMERSIVE MANAGEMENT
    HOLDINGS LLC

17
COMPLAINT